EXHIBIT 1 – SHARPE DECLARATION


PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO QUASH AND FOR
PROTECTIVE ORDER TO PROHIBIT DEPOSITION
OF WILLIAM P. DOWNEY, II

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### Civil Action No. 3:24-cv-0927-FDW-DCK

| | |
|---|---|
| **BRENT ROBERTS and**<br>**REGINALD E. BLOOM, JR.,** | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) |
| **GASTON COUNTY, NORTH CAROLINA,**<br>**GASTON COUNTY BOARD OF COUNTY**<br>**COMMISSIONERS, In its Official Capacity,**<br>**and CHAD BROWN, In His Individual Capacity,**<br>**and STEPHEN ZILL, In His Individual**<br>**Capacity.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) <br> ) <br> ) |

## DECLARATION OF JENNY L. SHARPE

The undersigned, Jenny L. Sharpe, pursuant to 28 U.S.C. § 1746, does hereby declare under penalty of perjury that the following is true and correct:

1. I am an adult citizen and resident of Mecklenburg County, North Carolina and I am a duly licensed North Carolina attorney and have been since 1986. I am the founder of J Sharpe, PLLC. I make this Declaration based upon my own personal knowledge unless otherwise stated herein.

2. Since beginning my work as an attorney, I have been admitted to practice before the U.S. Fourth Circuit Court of Appeals, and the United States District Courts for the Western and Middle District Courts. I am a current member of the Mecklenburg County Bar Association and the N.C. State Bar Association.

1

3. I currently represent the Plaintiffs in the above-referenced civil rights case. I was retained by Brent Roberts to represent him in connection with his claims against the Gaston County on January 14, 2024. Subsequently, Reginald Bloom also retained me to represent him in connection with this matter. Both Plaintiffs are employed by Defendant, Gaston County, North Carolina, as Captains within the Gaston County Police Department (the "GCPD").

4. Before I undertook my representation of the Plaintiffs, I also represented Suzanne Mauney Smith against Gaston County in early 2023. At the time of my representation of her, Ms. Smith was employed as an Assistant Chief of Police with the GCPD. She filed an internal grievance with the County concerning the promotional process surrounding the selection of the new Chief of Police. (See, Excerpts from Deposition of Suzanne Mauney-Smith, attached hereto as **Exhibit A**, at 85-86) She also filed a charge of discrimination with the EEOC (*Id.*) Thereafter, Ms. Smith and the County resolved their dispute during 2023. (*Id.*, at 91) Ms. Smith is no longer employed by Defendants. Defendants' current counsel, Kathleen Lucchesi, represented Gaston County in connection with Ms. Smith's legal matter.

5. During my representation of Ms. Smith, I became aware of Captain William Downey, who, according to Ms. Smith, had been one of the candidates encouraged to apply for the position of Chief of Police by Defendant Chad Brown, had applied for the position, and had been selected, along with two other internal candidates, to go through the interview and assessment center process for the position. (*Id.*, at 54-56, 59-61, 72-75; see also, Excerpts from the Deposition of Chad Brown, attached hereto as **Exhibit B,** at 90-95, 126-29)) Ms. Smith identified Captain Downey as a potential witness who would be supportive of her legal claims against the County. (Ex. A, Smith Dep*.,* at 86) Captain Downey, was, according to her deposition testimony, interviewed by Gaston County HR staff, Susan Allen and Ken Henderson. (*Id.*) I was

2

aware in early 2023 – before Captain Downey sought to have a consultation with me  – that he was a potentially hostile witness to the County and not supportive of Gaston County's defenses as to the selection process for the new Chief of Police.   Ms. Lucchesi was aware of these facts, and in particular, was aware that Captain Downey would be an adverse witness to the County, too, given her knowledge of the investigation conducted by the County in response to Ms. Smith's grievance and EEOC charge. That investigation occurred well before my December 14, 2023 consultation with Captain Downey and well before the institution of the present litigation.

6.   After the resolution of Ms. Smith's claim against the County, Captain Downey, who was and still is employed by the GCPD, met with me at his request on December 14, 2023 to discuss potential legal claims related to his employment with Gaston County. (Declaration of W. P. Downey, DE 70-2)  We met in person at my office for the consultation and he paid my office for our time in consultation. A follow-up email exchange occurred with Captain Downey on December 20 and 20, 2023. Following the date of my consultation and the exchange of follow-up emails, Captain Downey never retained my office to represent him. I have never represented him in any legal dispute involving the County or any other party to this action or in any other matter before or after his consultation with me.

7.   Contrary to the Defendants' assertion in their Memorandum in Support of their Motion to Quash and Motion for Protective Order, and Captain Downey's Declaration, I did not use any material disclosed by Captain Downey in drafting the Complaint or Amended Complaint filed in this action.  I was aware of certain facts about Captain Downey that I learned during my representation of Ms. Smith and prior to my consultation with him. Further, Captain Downey had disclosed information to Captains Roberts and Bloom which was favorable to the current litigation **before** and  **after** his consultation with me. (See, Declarations of Brent Roberts and

3

Reginald E. Bloom, filed contemporaneously with Plaintiffs' Memorandum in Opposition to Defendants' Motion to Quash and for Protective Order) I learned what Captain Downey communicated to Ms. Smith and to the Plaintiffs outside the confines of our attorney-client communication **prior** to drafting the Complaint and Amended Complaint.

8. During my representation of Ms. Smith and before my consultation with him, I did not personally speak to Captain Downey nor did I attempt to obtain a statement from him given his rank with the GCPD and the N.C. Rules of Professional Conduct. Since the date I was retained to represent the Plaintiffs in the current action, I have not initiated any communication with him nor have I attempted to obtain any statement from him.          .

9. Plaintiff's identified Captain Downey as a witness in their Rule 26 Disclosures, served April 15, 2025. Captain Downey was later identified as a witness in Plaintiffs' Objections & Response to Defendants' First Set of Interrogatories served June 25, 2025. On July 8, 2025, Plaintiffs served their Privilege Log in connection with their Objections and Responses to Defendants' First Set of Interrogatories. (See, **Exhibit C**, attached hereto)  Plaintiffs plainly asserted the attorney-client and work product privileges with regard to Captain Downey's email to me on December 1, 2023 and the content of his consultation with me on December 14, 2023.

10. Since the inception of the present litigation, Defendants County, Board of County Commissioners, and Zill, as well as Brown, have sought to delay written discovery in this matter. On June 28 and July 7, 2025, Defendants made their initial document production containing approximately 5,000 pages of documents. Both their initial document production and responses to Plaintiffs' First Set of Interrogatories & Requests for Production of Documents were deficient. On August 26, 2025, my co-counsel, Ms. Fosbinder, sent a deficiency letter sent to Ms. Lucchesi regarding Gaston County's responses outlining in detail the deficiencies in the County's

4

responses to Plaintiff's first written discovery. Ms. Lucchesi has yet to respond to the deficiencies noted in Ms. Fosbinder's correspondence. A copy of Ms. Fosbinder's August 26th deficiency letter is attached hereto as **Exhibit D**.

11. Further, on August 19, 2025, Plaintiffs served a second request for production of documents upon Gaston County. Defendant County did not serve any response to this document request within the 30-day deadline nor did it request any extension of time. By email dated September 30, 2025, I notified Ms. Lucchesi that we had not received timely responses to our second requests for documents. Documents responsive to this second request still have not been received. A copy of my emails to Ms. Lucchesi is attached hereto as **Exhibit E**. I view the documents sought for production to be critical in connection with the deposition of Chief Zill whose deposition is scheduled to take place on October 24, 2025.

12. The taking of witness depositions in this matter have also been delayed by Defendants' counsel. For example, in an effort to schedule the depositions of County witnesses, co-counsel, Ms. Fosbinder, requested by email dated April 15, 2025, that Ms. Lucchesi provide us with dates during the period May 15 through June 30, 2025 when we could conduct witness depositions of the individual Defendants, Zill and Brown, Captain Downey, Anderson Holder, Vincent Wong and Susan Allen. Counsel for Defendants did not respond to this email until Plaintiffs served notices of depositions of these witnesses on May 19, 2025. In response, counsel for Defendants stated she was unavailable on two of the dates contained in the notice. Counsel for Defendants did not offer alternate dates.

13. On July 23, 2025, Plaintiffs served an amended notice of depositions for the individual Defendants, Zill and Brown, Captain Downey, Anderson Holder, Vincent Wong and Suzanne Smith. The dates for these depositions were scheduled in concert with Defendants' counsel.

5

Subsequently, counsel for Defendants stated she was unable to attend and that the witnesses had conflicts on the dates the depositions of Holder, Downey, Zill and Wong were noticed.

14. On July 30, 2025, I received a text message from Captain Downey. This text message is available for *in camera* review by this Court. The text message is important to the issues at hand because it demonstrates, in writing, that my representation of the Plaintiffs in this case is not adverse to the interests of Captain Downey. In response to his text, I indicated that I could not speak to him due to the State Bar's ethical rules.

15. Following Captain Downey's text message to me, I later received a phone call on July 30, 2025 from Ben Chesson, a Charlotte attorney with Brooks-Pierce, whom I assumed would be representing Captain Downey in his upcoming deposition scheduled, at that time, for August 14, 2025. Mr. Chesson did raise a concern about disclosure of information or documents provided to me during Captain Downey's consultation with me. At the time, I was actually glad that Captain Downey had consulted with another attorney and would have a neutral advocate present at his deposition to assert the attorney-client privilege on his behalf and to address and discuss whether Downey had waived the privilege in connection with his discussions with Ms. Smith and Captains Roberts and Bloom. At Mr. Chesson's request, I provided him with a copy of the Amended Complaint filed in the matter, as well as the deposition notice for Captain Downey's deposition. I called Mr. Chesson on August 11, 2025, but he never returned my call and I have not heard from him since that time. He has not entered an appearance in this matter on behalf of Captain Downey.

16. The deposition of Ms. Smith on July 31, 2025 and the deposition of Chad Brown on August 19, 2025 went forward as scheduled. The depositions of Downey, Zill, Holder and Wong were postponed. Given the scheduling conflicts, the parties requested that this Court extend the

6

deadlines set forth in this Court's Case Management Plan. [DE 67] This Court granted the parties

joint motion and extended the deadlines. [DE 68] Notably, the Plaintiffs' expert report deadline

was extended to December 5, 2025 and the discovery completion deadline was extended to

February 5, 2026.

17. The parties then agreed to take the deposition of Vincent Wong on October 3, the

deposition of Captain Downey on October 8, 2025, the deposition of Anderson Holder on

October 15, 2025, the deposition of Chief Zill on October 24, 2025 and the depositions of the

Plaintiffs on October 27 and 29, respectively. Plaintiffs' served a Second Amended Notice of

Depositions to Defendants on September 15, 2025. [DE 70-1]

18. On September 30, 2025, counsel for Defendant Chad Brown served supplemental

responses to Plaintiffs' First Requests for Production of Documents. These new documents

consisted of text messages Mr. Brown had with Captain Downey during the time period just prior

to and at the time of the County's announcement of the Chief of Police position during the fourth

quarter of 2022. These texts were exchanged well-before my consultation with Captain Downey

in later 2023. The Plaintiffs had originally asked for this material before Mr. Brown's deposition

in their discovery requests and in a deficiency letter sent to Ms. Milak. Because these documents

were produced **after** Mr. Brown's deposition, Plaintiffs did not have any opportunity to cross-

examine Mr. Brown regarding his text messaging with Captain Downey. (See, Correspondence

dated September 30, 2025 regarding supplementation of Brown's answers to Plaintiffs' First

Requests for Production of Documents, attached hereto as **Exhibit F**)

19. On the afternoon of October 2, 2025, the Defendants served 10,000 pages of documents

which were purportedly meant to supplement their initial document production. Because of the

voluminous nature of the production, counsel for Plaintiffs could not cull through these

7

documents in any meaningful way before Mr. Wong's deposition scheduled for October 3rd. As a result, Plaintiffs were forced to postpone Mr. Wong's deposition. Counsel for Plaintiffs suggested alternate dates on which Mr. Wong might be deposed. Counsel for Defendants has not yet provided alternate dates for Mr. Wong's deposition.

20. On October 6, 2025, at 5:53 p.m., Ms. Lucchesi emailed her letter requesting the withdrawal of the deposition notice of Captain Downey and threatened to file the current Motion to Quash and Motion for Protective Order. [DE 70-4] In her letter, Ms. Lucchesi indicated that she is asserting a claim of privilege on Captain Downey's behalf and was purportedly unaware of my December 2023 meeting. As previously stated, Ms. Lucchesi has had knowledge that Captain Downey is a witness that is hostile to the County due to her prior representation of the County in the Smith matter. Furthermore, she had knowledge of Captain Downey's December 2023 consultation with me at least by July 8, 2025, the date her clients were served with Defendants' privilege log. Her assertion that she will be acting as his attorney and intends to raise the attorney-client privilege on his behalf would appear to raise an ethical conflict for her and her firm under the same Rules of Professional Responsibility she has asserted prohibits me or my co-counsel from taking Captain Downey's deposition.

21. In response to Ms. Lucchesi' letter I did call the State Bar on October 7, 2025 regarding my ethical obligations concerning Captain Downey. I was referred to Rule 1.9 of the Rules of Professional Conduct. I was advised that no conflict existed in connection with my current representation of the Plaintiffs.

22. Comment [2] of Rule 1.9 in particular addresses the issues raised by Defendants' motion. Comment [2] states,

> The scope of a 'matter' for purposes of this Rule depends upon the facts
> of the particular situation or transaction. The lawyer's involvement in a

8

> matter can also be a question of degree. When a lawyer has been directly
> involved in a specific transaction, subsequent representation of other clients
> with materially adverse interests in that transaction clearly is prohibited.
> The underlying question is whether the lawyer was so involved in the matter
> that the subsequent representation can be justly regarded as a changing of
> sides in the matter in question.

I had no involvement in Captain Downey's legal dispute with the County beyond my

consultation with him. I met with him one time. Further, based upon the testimony of Ms. Smith,

my representation of the Plaintiffs' case can hardly be seen as "a changing of sides in the matter

in question."

23. At 4:20 p.m. on October 7, 2025, I responded to Ms. Lucchesi's emails. Defendants then

filed their current Motion to Quash and Motion for Protective Order with the Court at 10:12 p.m.

and advised that Captain Downey would not be present for his deposition which was scheduled

to begin at 9:30 a.m. on October 8th. Ms. Fosbinder also sent an email to Ms. Lucchesi as well.

Ms. Lucchesi provided no legal authority to either of us to support her unilateral cancellation of

Plaintiffs' deposition of Captain Downey. A copy of my and Ms. Fosbinder's emails to Ms.

Lucchesi are attached hereto as **Exhibit G**.

24. My representation of the Plaintiffs in this matter is not adverse to Captain Downey's

interest as defined by Rules 1.7 and 1.9. First, Captain Downey made statements to Ms. Smith

which are adverse to the interest of the Defendants *before* his December, 2023 consultation with

me. He has made statements to both Plaintiffs both *before* and *after* the December, 2023 meeting

which are supportive of their claims. (See, Declarations of Brent Roberts and Reginald E.

Bloom, Jr.) These statements were made to Ms. Smith and the Plaintiffs outside the confines of

the attorney-client communication that is the subject of Defendants' motion. Such statements are

not protected by the attorney-client privilege and/or would constitute a waiver of that privilege if

they were made during the December 2023 consultation with me. Moreover, those statements are

supportive of the claims asserted in the current litigation. The July 30, 2025 text message I received from Captain Downey as referenced in Paragraph 14, above, will further elucidate the point that my representation of the Plaintiffs in the current action is not adverse to him.

25. Secondly, I am well-aware of my ethical obligations concerning the content of my consultation with Captain Downey. A privilege log has been provided to Defendants and no documents provided by Captain Downey to me during our December 2023 consultation have been produced during this litigation. Defendants have assumed that my examination of him during his deposition will be confined to topics we may have discussed during his December 2023 consultation and/or that I will introduce as exhibits documents he provided to me. This is both incorrect and pure speculation. The Amended Complaint filed in this action makes clear that Captain Downey may be examined on a wide range of topics, other than his potential legal claims against the County. Such topics could include race discrimination and retaliation within the GCPD, the promotional processes used to select Assistant Chiefs, as well as any statements he has made to non-lawyers which pertain to the Plaintiffs' claims, including his text messages to Chad Brown. The fact that Ms. Lucchesi unilaterally and abruptly cancelled the deposition of Captain Downey has afforded no meaningful opportunity to confer in accordance with the Local Rules regarding the appropriate limits of inquiry during his deposition. Further, the Court has already entered a Protective Order in this matter upon the joint motion of counsel.

26. Thirdly, Ms. Lucchesi has a concurrent conflict in connection with her representation of Captain Downey. As noted by Captain Downey in his Declaration, he met with me "and discussed . . . potential legal claims related to [his] employment with Gaston County, North Carolina." [DE 70-2] This statement alone indicates that Captain Downey's interests in this litigation are not aligned with the Defendants' interests in this case. Indeed, based upon my

almost 40 years of legal experience, there is a potential danger that Captain Downey could be subject to reprisal by his employer following his truthful testimony, particularly if his testimony does not align with the Defendants' defense to Plaintiffs' federal discrimination claims.

27. Finally, Defendants' motion would appear to be part of a larger strategy to delay and thwart Plaintiffs' discovery efforts. While my co-counsel and I have attempted to confer with Defendants' counsel to resolve the discovery disputes that have arisen, Defendants have largely ignored them. The fact that Defendants' counsel have been persistently dilatory in scheduling witness depositions and in their document production – now coupled with their failure to timely respond to Plaintiffs' Second Requests for Production with no assurances that these documents will be produced in advance of the upcoming deposition of Chief Zill on October 24, 2025 and in a manner that will allow Plaintiffs' reasonable time to review them before the deposition – is telling in light of their current motion and suggests that their current motion has been filed in bad faith and for the purpose of delay.

SIGNED UNDER PENALTY OF PERJURY, this the 21st day of October, 2025.

Jenny L. Sharpe
Counsel for Plaintiffs
N.C. State Bar No. 13698

11

# EXHIBIT A

## SHARPE DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-cv-0927-DCK

BRENT ROBERTS and REGINALD E.    )
BLOOM, JR.,    )
    )
           Plaintiffs,    )
    )
   vs.    )
    )
GASTON COUNTY, NORTH CAROLINA,    )
GASTON COUNTY BOARD OF COUNTY    )
COMMISSIONERS, in its Official    )
Capacity, and CHAD BROWN, in    )
his Individual Capacity, and    )
STEPHEN ZILL, in his Individual    )
Capacity,    )
    )
           Defendants.    )
    )

D E P O S I T I O N

OF

**SUZANNE MAUNEY-SMITH**

At Charlotte, North Carolina

Thursday, July 31, 2025

REPORTER:   MELISSA A. DONNELLY
          Notary Public

**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC  28105
980.339.3575

1  Q.  Do you recall the date that she did contact you?

2  A.  Not right off.

3  Q.  What did she tell you about the process?

4  A.  That I would be moving forward but to not tell -- not

5      to talk about it.

6  Q.  And did you have any communications with anyone else

7      about the process after she contacted you?

8  A.  I got a call from Billy Downey asking me if I had

9      heard anything, and I told him that I had but I

10     wasn't allowed to talk about it.  And he told me that

11     he had not received a call.

12 Q.  So who is Billy Downey, for the record?

13 A.  He's -- he was and is still, currently, a captain

14     with the Gaston County Police Department.

15 Q.  And at the time that he contacted you, were you aware

16     that he had applied for the position of chief of

17     police?

18 A.  He was the only other person that actually met the

19     minimum standards to apply.  That did apply.

20 Q.  Did he meet the preferred qualifications?

21 A.  He did not.

22 Q.  So when you got the call from Captain Downey, had you

23     known that he was an applicant prior to that call?

24 A.  I don't know if anyone had told me that he had

25     applied or not right -- right off.  I'm -- I probably

1        did know at that point, and I had heard that Reid

2        Rollins had applied.

3    Q.   How did you -- well, how did you hear or become aware

4        of the fact that Reid Rollins had applied?

5    A.   I think that came from Billy Downey as well.

6    Q.   And Reid Rollins was also a captain with the GCPD at

7        that time; is that correct?

8    A.   Yes, ma'am.

9    Q.   To your knowledge, were there any other captains that

10       applied for the position that were employed by the

11       GCPD?

12   A.   Stephen Zill.

13   Q.   How did you become aware that Stephen Zill had become

14       or was an applicant for the position?

15   A.   That may have came from Billy as well.

16   Q.   And at the time that you applied for the chief of

17       police position, did Reid Rollins meet the minimum

18       and preferred qualifications for the position?

19   A.   He did not meet the minimum qualifications of command

20       experience.

21   Q.   How much command experience had he had, to your

22       knowledge?

23   A.   It was -- it was over four but less than five.

24   Q.   And with respect to Stephen Zill, did he meet the

25       minimum and preferred qualifications?

1    A.    He did not.

2    Q.    And why did he not meet those preferred or minimum

3          qualifications?

4    A.    He had 19 months of command experience.

5    Q.    And when you say "command experience," you're talking

6          about what level of experience?

7    A.    Captain or above.

8    Q.    Now, to your knowledge, were there other captains --

9          well, strike that.

10              In November of 2023, who were the other

11         captains working with the GCPD at that time?

12   A.    I know Brent Roberts was one, Matt Hensley, I believe

13         Kyle Yancey.

14   Q.    What about Eric Johnson?

15   A.    Eric Johnson.  I'm sorry.  He retired, so he's now

16         not on my radar, I guess.

17   Q.    And with respect to Eric Johnson, he is an

18         African-American, correct?

19   A.    He is.

20   Q.    As well as Brent.  And then Matt Hensley and Kyle

21         Yancey are white; is that correct?

22   A.    Yes.

23   Q.    At the time you applied for the position, Brent was a

24         captain, but was he assigned to any particular

25         division?

 1   A.   Correct.

 2   Q.   So when Billy Downey called you, what did he tell you

 3        about his own application for chief of police?

 4   A.   Chad Brown had actually asked a few people to apply.

 5   Q.   Did Mr. Downey tell you this?

 6   A.   Downey basically just told me that Chad Brown said

 7        that I would never be chief of police.

 8   Q.   Was that in that first call that he had with you?

 9   A.   Not -- in the first call when he asked if I had heard

10        anything and I told him that I had, he said he had

11        not.  That was basically it on that.  He got with the

12        other two and started discussing it, and the other

13        two had not received a call either.

14   Q.   And for the record, Chad Brown at that time was the

15        Chairman of the Board of County Commissioners.  Is

16        that correct?

17   A.   That is correct.

18   Q.   During that call with Mr. Downey -- excuse me, with

19        Captain Downey, did he tell you that Chad Brown had

20        encouraged him to apply at that time?

21   A.   I don't recall that exactly, but he did say that --

22        at some point -- I don't remember if it was that

23        call -- he did state that Chad had encouraged him to

24        apply, had encouraged Reid Rollins to apply.

25   Q.   What about Stephen Zill?

1   A.   I don't think he actually said anything at that point

2        about Zill.

3   Q.   Was Captain Downey related to Stephen Zill at the

4        time?

5   A.   Yes.

6   Q.   Okay.  What was the family -- familial relationship?

7   A.   Downey is married to Zill's youngest sister.

8   Q.   So you hear from Amia Massey sometime in early

9        January of 2023.  Did you hear from her again after

10       that initial call?

11  A.   When she told me that -- or she gave me the date that

12       I would be going through the assessment.

13  Q.   Did you have a subsequent call with Captain Downey in

14       which he told you that he was also going to be going

15       forward in the process?

16  A.   Downey called me days after I was told I was moving

17       forward and told me that he had gotten a call, I want

18       to say, over the weekend that he would be moving

19       forward in the process.

20  Q.   Did you understand that Reid Rollins and Stephen Zill

21       were also going to be moved forward?

22  A.   They had already talked about it amongst themselves,

23       and Billy told me.

24  Q.   Did you hear anything from Chief Ramey about the

25       promotional process during the time, let's say, in

```
 1        January of 2022?
 2   A.   He actually said that he had had a conversation with
 3        Vincent Wong.
 4   Q.   And who is Vincent Wong, for the record?
 5   A.   At that -- I'm not exactly sure what his position was
 6        at that time.  He was -- he -- I don't remember
 7        exactly what his position, but he worked under the
 8        county manager.  And Vincent told him that there was
 9        only one person -- that there were six people going
10        forward in the process, and there was only one
11        internal candidate.
12             MS. LUCCHESI:  I'm sorry.  I didn't hear who
13                 you said --
14             THE WITNESS:  Vincent Wong.
15             MS. LUCCHESI:  No.  Who did he tell?
16             THE WITNESS:  He told Chief Ramey.
17             MS. LUCCHESI:  Oh, sorry.
18   BY MS. SHARPE:
19   Q.   Did Chief Ramey tell you anything else about it?
20   A.   That I was the one internal candidate.
21   Q.   And so when Captain Downey called you and said that
22        he was going forward, too, was that a surprise to
23        you?
24   A.   Yes.  Ramey had also -- he's -- he's the one that
25        told me that the internal candidates, all those
```

1   Q.   So when was the next time you heard from anyone

2        regarding the promotional process?

3   A.   The last thing that stands out is when I was called

4        by Mia Massey to meet her.

5   Q.   Do you recall when that was?  Was that in January or

6        it was in February?

7   A.   It was probably early February because the assessment

8        was on the 23rd.  I want to say it was early

9        February.

10  Q.   And what did she tell you at that time?

11  A.   That I did not receive the position, that it appeared

12       that I didn't want the position, I left meat on the

13       bones, and I declined to comment too much during the

14       interview.

15  Q.   Did you want the position?

16  A.   Absolutely.

17  Q.   And did you tell her that?

18  A.   At that point, I'm emotional and, you know, you're

19       sitting here telling me that I didn't get it, and I

20       wasn't going to sit there and debate anything with

21       her.  You know, it's kind of one of those things.

22       Why would I put myself through this if I didn't want

23       the position?

24  Q.   Did you offer any response when she said that you

25       left meat on the bones?  Did you know what that was

1        about?

2    A.  I don't know what that was about.  I did tell her --

3        she told me -- she said something about me making the

4        statement that I didn't want to be chief.  And I did

5        explain to her that even to this day, you know -- and

6        I would walk through the halls of the police

7        department, you know, "My name is Suzanne.  My mama

8        didn't give me a title."  You know, if it's something

9        that we have to go title, then we will, but it's --

10       I'm not title driven.  I want the best person for the

11       job.

12   Q.  And you thought you were the best person?

13   A.  Absolutely.

14   Q.  Did you learn in your conversation with Ms. Massey

15       that Stephen Zill had received the position?

16   A.  Not -- not in that conversation.

17   Q.  When did you find out that Stephen Zill had been

18       promoted to the chief of police?

19   A.  I went back to the police department toward Sarg- --

20       toward Chief Ramey's office.  I opened the door, and

21       Shelor and Jentsch were sitting in his office.  And

22       I -- and I just looked at them.  I said, "Well, it

23       wasn't me."  And he said, "No, it's Stephen Zill."

24   Q.  Who said that?

25   A.  Chief Ramey.  He had just gotten a call right before

1      I walked in.

2  Q.  And was there any discussion between you, Shelor, and

3      Ramey and Jentsch about Stephen Zill's qualifications

4      at that time?

5  A.  He wasn't qualified.  I mean, we all know he wasn't

6      qualified.

7  Q.  Did Chief Ramey state the obvious at that point?

8  A.  I'm sure he did.  I mean, there was -- it was an

9      emotional room at that point.

10 Q.  Now, you had indicated that before Stephen Zill had

11     been promoted as chief of police, that Mr. Downey had

12     told you about a conversation he had with Chad Brown

13     in which he stated that you would never be chief of

14     police.

15 A.  I think a lot of these conversations started after

16     the announcement was made, but he did make that

17     statement to me.

18 Q.  What other communications did you have with

19     Mr. Downey after Stephen Zill was promoted?

20 A.  Downey was worried because the County has a nepotism

21     policy, and Zill was not allowed to supervise him.

22     So Downey was worried about losing his job.  And I'm

23     sure there were other conversations, just ...

24 Q.  Did he talk to you in further detail about his

25     communications with Chad Brown as it concerned you?

1    A.    I don't recall right off.

2    Q.    Did you have any communications with a person by the

3          name of Captain Matt Hensley?

4    A.    Yes.

5                MS. LUCCHESI:  I'm sorry.  Could you speak up

6                     a little bit, Jenny?

7                MS. SHARPE:  Yeah.

8    Q.    Did you speak with Captain Matt Hensley?

9    A.    Yes.  Matt Hensley also told me that Chad Brown had

10         told him that I, by name, would never be chief -- or

11         would not be chief of police.

12   Q.    Did Captain Hensley tell you anything about why Chad

13         Brown felt that way about you?

14   A.    One of the them, somebody -- and I can't say whether

15         it was Matt or Billy Downey, Matt Hensley or Billy

16         Downey -- one of them said that -- something about

17         the lake, the boat patrol, marine unit, that I had

18         lied to him about the marine unit, and that dates

19         back a couple years.  I've never had a conversation

20         with Chad Brown about the marine unit.

21               But a couple years prior, Ramey and I had

22         discussed taking the marine unit off the lake.  It

23         was either Monday through Wednesday or Monday through

24         Thursday because it was a waste of gas, a waste of

25         time, a waste of manpower.  And Lake Wylie does not

1    A.    I don't recall right off.

2    Q.    Did you have any communications with a person by the

3          name of Captain Matt Hensley?

4    A.    Yes.

5                MS. LUCCHESI:  I'm sorry.  Could you speak up

6                      a little bit, Jenny?

7                MS. SHARPE:  Yeah.

8    Q.    Did you speak with Captain Matt Hensley?

9    A.    Yes.  Matt Hensley also told me that Chad Brown had

10         told him that I, by name, would never be chief -- or

11         would not be chief of police.

12   Q.    Did Captain Hensley tell you anything about why Chad

13         Brown felt that way about you?

14   A.    One of the them, somebody -- and I can't say whether

15         it was Matt or Billy Downey, Matt Hensley or Billy

16         Downey -- one of them said that -- something about

17         the lake, the boat patrol, marine unit, that I had

18         lied to him about the marine unit, and that dates

19         back a couple years.  I've never had a conversation

20         with Chad Brown about the marine unit.

21               But a couple years prior, Ramey and I had

22         discussed taking the marine unit off the lake.  It

23         was either Monday through Wednesday or Monday through

24         Thursday because it was a waste of gas, a waste of

25         time, a waste of manpower.  And Lake Wylie does not

1      have a big population on the lake during those days.

2      So, you know, we put the boat on the lake on Friday,

3      Saturday, and Sunday where it is more populated.

4          And Ramey actually -- Ramey made that change

5      and then was directed immediately that the boat would

6      be back on the lake seven days a week.

7  Q.  Who directed him?

8  A.  The manager directed him at the direction of Chad

9      Brown.

10 Q.  And is that what Matt Hensley told you, or

11     Mr. Downey?

12 A.  It was -- one of the two said that I had lied to --

13     something about the lake patrol, and, I mean -- and

14     there's -- there's other things that I think prompted

15     Brown.

16 Q.  Like what?

17 A.  There's another -- he had -- he has another friend

18     who was a county police officer, Ron Robinson.  Ron

19     Robinson, as an SRO, when I was over SROs, I got a

20     report that he was sitting more than he was doing his

21     job.  So over the next summer, I moved people around.

22     You know, if this principal is having an issue with

23     their SRO, let's try at this school.  Let's try it.

24     Didn't remove him from SRO, just changed the school,

25     and he was mad about that.

1              Ron Robinson and I had also, in another
2        meeting -- it was something that ERT was doing.  It
3        was when I was a vice captain.  I don't remember the
4        exact circumstances, but he looked at me and said,
5        "You don't have anything to do with ERT."  And I had
6        to reiterate, "Well, I'm a captain, and I do have
7        something to do with vice."  And that was one of
8        those things where I said what I had to say, and I
9        just exited the room.
10  Q.   So with respect to Ron Robinson, this happened while
11       you were a captain.  Did you discipline him?
12  A.   I did not.
13  Q.   And so did you believe that he was being
14       insubordinate to you when he --
15  A.   He was.
16  Q.   -- made that comment?
17  A.   He was.
18  Q.   And so with respect to Ron Robinson and Chad Brown,
19       what was their connection again?
20  A.   They're friends.
21  Q.   Okay.
22  A.   I mean, just acquaintances.  Well, no, they're
23       friends.
24  Q.   Was Ron Robinson also part of the marine unit?
25  A.   Yes.

1   A.   Yes.  Yes.  He was the public information officer for

2        the County.

3   Q.   And did you file a grievance regarding your

4        nonselection for promotion?

5   A.   I did.

6   Q.   Okay.  And what was the basis of your grievance?

7   A.   Gender.

8   Q.   Okay.  You alleged gender discrimination?

9   A.   Yes, ma'am.

10  Q.   Okay.  And you subsequently filed a charge of

11       discrimination against the County with the Equal

12       Employment Opportunity Commission.  Is that correct?

13  A.   I did.

14  Q.   And with respect to your grievance, did anyone

15       investigate your claim of gender discrimination?

16  A.   Yes.

17  Q.   And who conducted an investigation?

18  A.   Susan Allen and Ken Henderson.

19  Q.   What were their positions within the County at that

20       time?

21  A.   They worked in HR.

22  Q.   And did Ken Henderson and Susan Allen interview you

23       regarding your complaint?

24  A.   They did.

25  Q.   Did they interview anyone else?

1    A.    I gave them a list of people.  As far as what they

2          gave me in return in like their findings, they did

3          not mention talking to anybody in their findings.

4    Q.    Did you mention that Captain Downey was a witness

5          that would be favorable to you?

6    A.    Yes.

7    Q.    Do you know whether or not Ken Henderson and Susan

8          Allen contacted Captain Downey during the course of

9          your investigation of your sex discrimination

10         complaint?

11   A.    I believe they contacted Downey and Hensley.  I'm not

12         sure if they contacted Eric Knupp or not.  I think

13         they may have.

14   Q.    And what was the result from your internal grievance?

15   A.    It was not sustained, or basically unfounded.

16   Q.    I'll show you another document.

17         (Plaintiffs' Exhibit 10 marked for identification.)

18   Q.    Okay.  I'm handing you what's been marked as

19         Plaintiffs' Exhibit Number 10.  It's R-B1217 through

20         1218.

21   A.    (Witness reviews document.)

22   Q.    And what is the exhibit?

23   A.    This is their response to my complaint for my

24         grievance.

25   Q.    And it's dated April 5th, 2023, correct?

```
 1   Q.   And who had been his predecessor in that position?

 2   A.   Billy Downey.

 3   Q.   All right.  Prior -- well, do you know why Billy

 4        Downey stepped down from being the commander of that

 5        unit?

 6   A.   He was getting pressure from his mother and his wife,

 7        that they did not want Zill to be in the dangers of

 8        entry, and they asked him to step down so Stephen

 9        could become the commander.

10   Q.   That's what Billy --

11   A.   That's what --

12   Q.   -- told you?

13   A.   That's what Billy told me.

14   Q.   Okay.

15             MS. FOSBINDER:  Excuse me.  Was that Zill and

16                  Downey?

17             MS. SHARPE:  Yes, Billy Downey.

18             THE WITNESS:  Downey was the previous

19                  commander.

20             MS. FOSBINDER:  I know, and I just -- her

21                  answer, I think, said Zill moved down.

22             MS. SHARPE:  Oh, I'm sorry.

23             THE WITNESS:  Oh, okay.  I'm sorry.

24   BY MS. SHARPE:

25   Q.   But you meant --
```

1   A.   It was Zill's mother and sister, Billy's wife, who

2        asked that he go ahead and step down so Zill could be

3        the commander and not be put in the dangerous position

4        of entry and things of that nature.

5   Q.   Did you ever have any discussions with Chief Ramey

6        about that particular issue?

7   A.   About Zill becoming commander?

8   Q.   Yeah.

9   A.   I don't believe so.

10  Q.   So you indicated that he had maybe a year of

11       command-level experience?

12  A.   I believe it was January when Billy -- January of '22

13       when Billy stepped down.  Of course, he was still

14       available for questions and mentoring for a while

15       after that.

16  Q.   So in order to be in a -- I guess as a commander of

17       the ERT, did you have to be a captain, or could you

18       hold it as a lower rank?

19  A.   I am not aware of anybody that has held it at a lower

20       rank.  Well, let me take -- I believe Eisenhower was

21       actually the one that retired as an assistant chief.

22  Q.   Uh-huh.

23  A.   I believe initially he may have been over ERT, but

24       there would have had to have been somebody higher to

25       command it.

1   Q.   How long had Stephen Zill been a captain at the time

2        he assumed command over the ERT?

3   A.   They only had 19 months.  Seven months or so.

4   Q.   So he had been elevated from sergeant to captain and

5        commander of ERT seven months prior to the date he

6        assumed that role?

7   A.   Probably around seven months.

8   Q.   And so, with respect to your charge of discrimination

9        that you filed with the Equal Employment Opportunity

10       Commission, you resolved that dispute with the

11       County, correct?

12  A.   Yes.

13  Q.   All right.

14            MS. SHARPE:  Well, let's take a break for a few

15                minutes, maybe for 15, 10 minutes.  I mean,

16                are you okay to go through lunch?

17            THE WITNESS:  I can actually talk right now,

18                so --

19            MS. SHARPE:  Okay.  Well --

20            THE WITNESS:  My throat is not acting up.

21            MS. SHARPE:  If everybody is okay with just

22                powering through, let's do that.  Okay?

23            THE WITNESS:  All right.

24            MS. SHARPE:  Okay.  Let's take about ten

25                minutes or so.

# EXHIBIT B

## SHARPE DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:24-cv-0927-DCK

BRENT ROBERTS and REGINALD E. )
BLOOM, JR., )
)
Plaintiffs, )
)
vs. )
)
GASTON COUNTY, NORTH CAROLINA; )
GASTON COUNTY BOARD OF COUNTY )
COMMISSIONERS, in its Official )
Capacity; and CHAD BROWN, in )
his Individual Capacity; and )
STEPHEN ZILL, in his Individual )
Capacity, )
)
Defendants. )
_____)

D E P O S I T I O N

OF

**CHAD BROWN**

At Charlotte, North Carolina

Tuesday, August 19, 2025

REPORTER:    ELAINE F. HAYES
             Notary Public

**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC  28105
980.339.3575

1       circular in what we were looking for, for maybe

2       culture or maybe trying to build morale, just general

3       type of practices, what you would want for somebody

4       who was going to lead an organization.

5   Q.  What did you want for someone who was going to lead

6       the police organization?

7   A.  I'd want somebody who was -- who had integrity, who

8       was a leader.  I mean, just intangibles that you'd

9       find in people.  There's nothing that specifically

10      stood out to say anything.  It was more of trying to

11      find, I think, the best candidate who you always want

12      when you're looking for something for an organization

13      as big as the county police.

14  Q.  Sure.  Did a lot of people apply for the job?

15  A.  I have no idea as far as whom all applied.  I know

16      that there was more than 10, maybe less than 50.

17  Q.  Somewhere between 10 and 50?

18  A.  Yes, ma'am.

19  Q.  Did you speak to any of the people who applied for

20      the chief of police job between the day the job was

21      posted and the day the job was filled?

22  A.  I could have, ma'am.  I have no idea as far as whom

23      all applied.  I mean, I talked to a lot of people,

24      had a lot of people inquire to me about the job, and

25      if someone would have said, you know, "Do you think I

```
 1        should apply for it," or whatever, I would always
 2        encourage any person.
 3   Q.   So if I had applied for the chief of police job, you
 4        would have encouraged me --
 5   A.   Yes, ma'am.
 6   Q.   -- even though I'd never been in law enforcement?
 7   A.   Yes, ma'am.
 8   Q.   So you just wanted to make sure there was a big pool
 9        of applicants?
10   A.   No, ma'am.
11   Q.   No?
12   A.   I wouldn't want to hurt your feelings, ma'am.
13   Q.   Okay.  We really don't need to worry about that.  So
14        who spoke to you and said, "Do you think I should
15        apply"?
16   A.   Several candidates, ma'am.
17   Q.   Who, please?
18   A.   Billy Downey has approached me.  Reid Rollins
19        approached me.  Officer Hensley.  I don't know his
20        first name.  I apologize.  Another one had approached
21        me, but I don't think he applied, was Jonathan Marr.
22        And I may have had a conversation with Chief Buie
23        about coming back.
24   Q.   Let's go through these people that you have named.
25        I'm sorry.  The third name was officer who?
```

1   A.   Hensley.  I don't know his first name.  I apologize.

2   Q.   So what I want you to do, please, sir, is to tell me,

3        again, the time frame.  You know, the goal posts are

4        between the date that the chief job is open and the

5        date that it's filled, so between those two dates,

6        what conversation or conversations did you have with

7        Billy Downey about the chief of police job?

8   A.   I think Billy had reached out to me about should he

9        apply.  I think there were some comments that he made

10       that he wanted to apply.  And like I said, for

11       anybody, I would encourage anybody who's --

12       especially if you're already involved in the

13       organization, you should be qualified already to hold

14       a position.  You hold a gun.  You hold that up.  So I

15       would encourage anybody who asked me the same

16       question.

17  Q.   When you say you would encourage anybody who asked

18       you the same question, earlier it sounded like you

19       would encourage even people that weren't qualified.

20       Is that right?

21  A.   Not correct, ma'am.

22  Q.   Okay.  Then I misunderstood.  You said you didn't

23       want to hurt my feelings, so in terms of people who

24       came to you, did anyone come to you who did not meet

25       the minimum qualifications for the police job?

1   A.   Let's go back.  The first question you asked me, you

2        said you asked me.

3   Q.   Correct.

4   A.   If you came to me and asked me, then I would

5        assume -- I'm not going to hurt your feelings.  I'm

6        going to say, "Hey, you should apply," but I didn't

7        go out actively seeking someone to say who was

8        qualified to -- "Hey, you off the street.  You're an

9        attorney.  Would you come and apply for the job?"

10            Second of all -- what was the second part of

11       your question?  I apologize.

12  Q.   I was just asking you whether you ever had anyone

13       come to you and ask if they should apply for the

14       chief of police job who was not meeting the minimum

15       qualifications?

16  A.   I would assume anybody who worked at the county

17       police should already have those qualifications, so

18       it wasn't a specific -- the only standard I know that

19       we have in the county police is you have to hold a

20       four-year degree in order to apply for a position

21       there at the county police.

22  Q.   You said a four-year degree was the only

23       qualification that you felt was required for the --

24  A.   No, ma'am.  That's the only thing that I know that is

25       required.  We've been asked several times throughout

1    our years to -- would we ever waive that to bring in
2    more people.  So that's the only reason I know that
3    there's a four-year -- but anybody who got qualified
4    from whatever it takes after you get past the -- if
5    you're a police officer already, I would assume you
6    have the wherewithal -- what your knowledge is.
7    Those will be vetted through the people who are
8    making the decisions.
9    Q.   So just to finish out with the four-year degree
10        requirement, what is your opinion about whether that
11        should be waived?
12   A.   I think it's a mixed base.  I think it -- I like the
13        fact.  I think it puts the county police on a
14        different pedestal.  I think it shows things for them
15        to be able to achieve requirements that are going on
16        inside of that to get started.  That was something
17        that was put in place well before I became a county
18        commissioner.
19   Q.   And what's the mixed feelings about it, then?
20   A.   We have two different law enforcements in Gaston
21        County, both of which -- they serve and protect and
22        no problem with that.  But I do think that the Gaston
23        County police, as far as a law enforcement agency, is
24        the elite among what we do in law enforcement in
25        Gaston County.  We do have 13 municipalities who

1       don't have such requirements, and I think that's why

2       our Gaston County Police Department is head and

3       shoulders above everybody who would be a part of

4       Gaston County.

5    Q.  Did you finish telling me what Billy Downey and you

6       discussed about the chief of police job after it was

7       posted?

8    A.  I think there were several communications where he

9       just asked me, and I'd always encourage anybody who

10      would ask me at that point.  You know, he's obviously

11      close enough to where he could come and speak to me

12      about that.  I just encouraged him as well.

13   Q.  Do you know if he did apply?

14   A.  I do not.  I'm pretty sure he did.  I can't remember.

15   Q.  And then you said another person that spoke to you

16      about the chief of police job was Reid Rollins.

17      Please tell me what you-all discussed about the chief

18      of police job.

19   A.  I was at my daughter's football game, and he

20      proceeded to sit down beside me and my mother the

21      entire night to speak about him applying for that

22      job.

23   Q.  What did you say?

24   A.  I encouraged him as well.  If I'm not mistaken, I

25      think he said he may be finishing up some extra

```
 1                       for that where it would be a reasonable
 2                       answer.  But it's fine with me.  And that's
 3                       what I finally was going to say, is that I
 4                       have all the time in the world, so you can
 5                       say whatever you want, Mr. Brown, and we'll
 6                       just keep going.
 7            MS. MILAK:  Don't say anything.  Just let her
 8                       ask a question.  We're only here to answer
 9                       questions.
10   BY MS. FOSBINDER:
11   Q.   I just want to make sure I understand your testimony
12        on this small issue.  In terms of the length of time
13        that any given person serves with the Gaston County
14        Police Department, is it your testimony that for
15        everybody there, you have no idea how long they've
16        been in their job?
17   A.   Yes, ma'am.
18   Q.   So, for example, Mr. Roberts sitting -- you've seen
19        Mr. Roberts before, right?
20   A.   In passing, yes, ma'am.
21   Q.   And do you know if he has more than five years with
22        the police department?
23   A.   No, I don't, ma'am.
24   Q.   With respect to Captain Downey, you spoke to him a
25        couple of times or more about the police chief
```

1         position, right?

2    A.   I only recall one time.  I think it was via text,

3         ma'am.

4    Q.   Oh, it was via text?

5    A.   It may have been -- it may have been something other

6         than -- but that's it.  In passing, it could be

7         anything.  It's not a problem.

8    Q.   And you encouraged him to apply, right?

9    A.   I encourage anybody who asks me, yes.

10   Q.   Did you encourage Captain Downey to apply?

11   A.   If he asked me, yes, I would, ma'am.

12   Q.   And you said he did ask you, right?

13   A.   So I'm sure I encouraged him to do so.

14   Q.   Did you also tell Captain Downey -- I'm sorry.  Did

15        Captain Downey also tell you that he was not as

16        qualified as one of the female assistant chiefs at

17        the department?

18   A.   I wouldn't know that, ma'am.

19   Q.   Did Captain Downey tell you that he didn't think he

20        was as qualified as Suzanne Mauney-Smith?

21   A.   She was an assistant chief at the time, so I don't

22        have any recollection of him saying that, but it very

23        well could have been.  But I would assume -- they're

24        all on the same page to me.  They wear a badge and a

25        gun and they protect me.  So at the end of the day, I

1      don't care what their qualifications are.  If they're

2      trying to do something, I want to make sure that they

3      do the right thing by protecting me.

4   Q.  Did you ever talk to Suzanne Mauney-Smith about the

5      position of police chief?

6   A.  No, ma'am.

7   Q.  Do you know if she applied?

8   A.  Yes, ma'am.

9   Q.  Did you ever talk to Mr. Downey about her application?

10  A.  Not that I know of, ma'am.

11  Q.  Do you recall telling Captain Downey that as long as

12     you had anything to do with it, Suzanne Mauney-Smith

13     would never become chief of police?

14  A.  I could have very well said that.  I don't recall,

15     but I could have.

16  Q.  And if you had said that, why would you have said

17     that?

18  A.  Just for the culture of things that happened there.

19     She had disparaged some little comments about myself

20     over time.  It was a difference of who she was.  I'm

21     not saying that she wasn't qualified.  It had nothing

22     to do -- but as far as the comment you made that said

23     as long as I have anything to do with it, I don't

24     have anything to do with it.  So obviously, she could

25     have been selected as well.  I'm pretty sure she was

1          in the final group of that as well.

2    Q.    So what did she say that was disparaging about you?

3    A.    Just making several comments to people that I knew

4          about me and different comments about -- I want to

5          say to the gist of that I thought I was better than

6          people or to that effect.  I don't remember what it

7          was at the time.  I know she had an issue with some

8          people who are -- she had approached me one time,

9          well into her tenure, about people who were making

10         more money than her, who had less time than her.

11   Q.    Okay.

12   A.    I took that to the chief and then made her objection

13         to what she wanted to talk about, and the chief at

14         that time was Chief Buie and he either took care of

15         it or whatever.  It was out of my hands.

16   Q.    So one time you remember talking directly to Suzanne

17         about her pay?

18   A.    About that particular issue because she brought it up

19         to me, I want to say in the gym one day.

20   Q.    So did you work out at the same gym as her?

21   A.    I think at that time it was.  I think she had another

22         gentleman with her.  I think it was Hamlin.  They

23         both, whatever position they were in, had issue with

24         people making more money who were in the hierarchy

25         who had less time than them.  Making more money was,

EXHIBIT C

SHARPE DECLARATION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No. 3:24-cv-0927-FDW-DCK**

| | |
|---|---|
| **BRENT ROBERTS and** | ) |
| **REGINALD E. BLOOM, JR.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **GASTON COUNTY, NORTH CAROLINA,** | ) |
| **GASTON COUNTY BOARD OF COUNTY** | ) |
| **COMMISSIONERS, In its Official Capacity,** | ) |
| **and CHAD BROWN, In His Individual Capacity,** | ) |
| **and STEPHEN ZILL, In His Individual** | ) |
| **Capacity.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## PLAINTIFF'S PRIVILEGE LOG

The Plaintiffs, Brent Roberts and Reginald E. Bloom, Jr., by and through the undersigned counsel, hereby serve the following privilege log regarding documents withheld in response to Defendants Gaston County, North Carolina, Gaston County Board of County Commissioners, and Stephen Zill's First Set of Interrogatories and First Requests for Production of Documents on the basis of privilege and the work product doctrine.

Documents in the possession of Plaintiffs or their counsel that are being withheld on the basis of the attorney-client privilege, work product doctrine, or any other applicable privilege and/or doctrine are described in the attached worksheet. Plaintiffs specifically reserve the right to supplement their privilege log periodically throughout the discovery period.

This the 8th day of July, 2025.

1

*/s/ Jenny L. Sharpe*
Jenny L. Sharpe
Attorney for Plaintiffs
N.C. State Bar No. 13698
**J SHARPE, PLLC**
15720 Brixham Hill Avenue
Suite 300
Charlotte, NC 28277
Telephone: (704) 944-3272
Facsimile: (704) 944-3201
Email: sharpeattorney@gmail.com

*/s/ Julie H. Fosbinder*
Julie H. Fosbinder
Attorney for Plaintiffs
N.C. State Bar No. 19400
**FOSBINDER LAW OFFICE**
840 Seneca Place
Charlotte, North Carolina 28210
Telephone: (704) 333-1428
Facsimile: (704) 560-8600
Email: Jhanfos2@gmail.com

2

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that she has served the foregoing Plaintiffs'

Privilege Log via email to the following counsel of records for the Defendants:

Jennifer B. Milak
**TEAGUE CAMPBELL DENNIS & GORHAM, LLP**
Post Office Box 19207
Raleigh, North Carolina 27619-9207
Email: jmilak@teaguecampbell.com
Attorney for Defendant Brown

&

Kathleen K. Lucchesi
Daniel Q. Leake, II
**JACKSON LEWIS**
200 S. College Street, Ste. 1550
Charlotte, North Carolina
Email: Kathlee.Lucchesi@jacksonlewis.com
Email: Daniel.Leake@jacksonlewis.com
Attorneys for Defendants Gaston County & Zill

This the 8th day of July, 2025.

/s/ Jenny L. Sharpe
Jenny L. Sharpe, Esq.
Counsel for Plaintiffs

3

## PLAINTIFFS' ROBERTS & BLOOM PRIVILEGE LOG
### Civil Action No. 3:24-cv-0927-DCK

ACP = Attorney Client Privilege
AWP = Attorney Work Product

| Bates No. | Document Type | Date | Author | Recipient | Persons with Access | Subject Matter | Privilege Claimed/Withheld or Redacted? |
|---|---|---|---|---|---|---|---|
| R-B000253-54 | Client notes | | R. Bloom | Plaintiffs' counsel | J. Sharpe; J. Fosbinder | | ACP Withheld/Redacted |
| R-B000269-70 | Forms W-2 | | | Plaintiffs' counsel | J. Sharpe; J. Fosbinder; R. Whitt | Tax payer identification number | TIN Redacted |
| R-B000276-79 | Forms W-2 | | | Plaintiffs' counsel | J. Sharpe; J. Fosbinder; R. Whitt | Tax payer identification number (TIN) | TIN Redacted |
| R-B000282, 284, 286,361-368 | Forms W-2 and 1099 | | | Plaintiffs' counsel | J. Sharpe; J. Fosbinder; R. Whitt | TIN | TIN Redacted |
| | Email exchange | 5/21/25 | B. Roberts | J. Sharpe; J. Fosbinder; R. Bloom | J. Sharpe; J. Fosbinder; Plaintiffs; GCPS.org | Privileged communications between client and counsel | Inadvertent Disclosure ACP |
| | Email exchanges | Various | J. Sharpe; Plaintiffs; J. Fosbinder | J. Sharpe; Plaintiffs; J. Fosbinder; | J. Sharpe; J. Fosbinder; Plaintiffs; J. Sprenger-Wilson | Privileged communications between client counsel | ACP, AWP Withheld |
| | Attorney notes | Various | J. Sharpe | J. Sharpe | J. Sharpe | Meetings/phone calls with clients | ACP; AWP Withheld |
| | Attorney notes | Various | J. Fosbinder | J. Fosbinder | J. Fosbinder | Meetings/phone calls with clients | ACP, AWP Withheld |
| | Legal staff notes | Various | J. Sprenger-Wilson | J. Sharpe; J. Fosbinder | J. Sharpe; J. Fosbinder; J. Sprenger-Wilson | Meetings/phone calls with clients | ACP, AWP Withheld |
| | Attorney Notes | Various | J. Sharpe | J. Sharpe; J. Fosbinder | J. Sharpe; J. Fosbinder | Consultation and meeting notes with S. Smith | ACP, AWP Withheld |
| | Emails | Various | J. Sharpe | J. Sharpe; S. Smith. | J. Sharpe; S. Smith; J. Fosbinder | Privileged communications between client and counsel. | ACP, AWP Withheld |
| | Email | 12/1/23 | B. Downey | J Sharpe | J. Sharpe; J. Fosbinder | Request for legal consultation | ACP Withheld |
| | Meeting notes; client documents | 12/14/23 | J. Sharpe | J. Sharpe | J. Sharpe; J. Fosbinder | Consultation and attorney meeting notes. | ACP; AWP Withheld |
| | Meeting notes and memo to file; client talking point | 11/12/24 | J. Sharpe; B. Lewis | J. Sharpe | J. Sharpe; J. Fosbinder | Consultation and attorney meeting notes. | ACP; AWP Withheld |
| | Email | 11/14/24 | J. Sharpe | B. Lewis | J. Sharpe; J. Fosbinder | Follow up email for purpose of rendering legal advice | ACP; AWP Withheld |
| | | | | | | | |

| Bates No. | Document Type | Date | Author | Recipient | Persons with Access | Subject Matter | Privilege Claimed/Withheld or Redacted? |
|-----------|---------------|------|--------|-----------|---------------------|----------------|------------------------------------------|
| R-B000253-54 | Typewritten notes | Undated | R. Bloom | J. Sharpe; J. Fosbinder | R. Bloom; B. Roberts; J. Sharpe; J Fosbinder | Case notes | ACP; AWP Redacted |

# EXHIBIT D

## SHARPE DECLARATION

# FOSBINDER LAW OFFICES
**840 Seneca Place**
**Charlotte, North Carolina 28210**

**(704) 560-8600**                                    **Jhanfos2@gmail.com**

August 26, 2025

Kathleen K. Lucchesi
Daniel Q. Leake, II
Jackson Lewis
200 South College Street
Suite 1550
Charlotte, North Carolina 28202

**Re:** **Roberts & Bloom v. Gaston County, NC, et al.**
**No. 3:24-cv-0927(WDNC 2024)**

Dear Counsel:

    We have reviewed Gaston County's written objections and responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents, along with your document production. My co-counsel and I request that you supplement your responses to Interrogatory (INT) Nos. 2, 3, 5, 7, 9, 10, 11, 12, 13, 14, 15, 16 and 17, and Request to Produce (RTP) Nos. 3, 4, 7, 8, 9, 10, 11, 15, 16, 18 and 23.

## I.
## INTERROGATORIES

*INT No.2.*: This Interrogatory asks you to Identify all complaints received by You during the period beginning January 1, 2016 through the present date, which relate to or involve complaints alleging racially discriminatory and/or retaliatory conduct, including but not limited to complaints involving the Gaston County Police Department (or "GCPD"), and defines complaints for the purpose on this interrogatory.

In your response, you refuse to provide complaints arising outside of the GCPD, yet have failed to explain why those complaints involving Defendant Gaston County employees, and likely the same County Human resources staff as those who investigated GCPD complaints, would not meet the discovery standard. Since Gaston County is one of the parties, information regarding such complaints is relevant.

Moreover, you have failed to even include the complaints about race discrimination made by the plaintiffs' co-worker, retired Captain, Eric Johnson, African American, including the complaint he made in 2019. Please supplement your response to this Interrogatory.

Similarly, our *Interrogatory No. 3* asks that you "with respect to each complaint identified ......
above, describe all efforts made by You to investigate said complaint: and then asks for details
regarding any investigations. "

After objecting, you provided some documents under FRCP 33(d). Consistent with your response to
number 3, you have not provided any documents other than those related to the Plaintiffs'
complaints. Please supplement your response to this Interrogatory consistent with your supplemental
response to No. 3.

*INT No. 5*:
This states "since the date of Defendant Stephen Zill's promotion to the position of Chief of Police,
identify by name and race each person receiving promotions within the Gaston County Police
Department."

After asserting various objections, you identified <u>some</u> persons receiving promotions within the
identified time frame, but failed to include <u>all</u> persons receiving promotions

Thus, your list does not include Assistant Chief Cole.   Please supplement your response to this
Interrogatory and answer it fully, including Mr. Cole and any others you have failed to include.

*INT No. 7*:     This states "[f]or the time period beginning January 1, 2015 through the present date,
identify all persons by name and race who have been promoted to the rank of Assistant Chief of
Police within the GCPD."

Your answer refers to your response to No. Five. Please supplement your response to this
Interrogatory No. 7 and answer it fully, including, of course, Mr. Cole.

*INT No. 9*:     This states "[i]dentify by date all positions for which each of the Plaintiffs have
applied and have been denied.  For each denial, state the name, race and current employment status of
the individual selected for the position." After objecting, you  stated that: "Plaintiff Bloom applied to
be a Field Training Officer in March 2016, but was not selected. The following officers were
selected: Kyle Yancey (W/M), David Rogers (W/M), Nicholas Jamoulis (W/M). Plaintiff Bloom
applied for Assistant Chief of Police in August 2024 but was not selected. Matthew Johnson (W/M)
was selected for the position.

        Plaintiff Roberts applied for the Assistant Chief of Police position in August 2024 but was
not selected. Matthew Johnson (W/M) was selected for the position."

        Your response fails to include several positions for which Plaintiff Roberts applied.  Those
include three applications he made to receive the rank of Captain in 2016 and 2017, and four
applications he made to receive the rank of sergeant, in or about 2008, 2005, 2003, and
2001. Captain Roberts also applied for Special Investigations in 2000. Your response also fails to
include several positions for which Plaintiff Bloom applied, including at least two applications he
made to the position of Sergeant before his ultimate selection.

        Thus, please carefully review your records and fully answer this interrogatory.   Provide a
complete list of all people who did receive the position of Captain in 2016 and 2017, as well as

those people who received the position of Sergeant each time that Plaintiff Roberts applied and each time that Captain Bloom applied and were not selected.

*INT No. 10 through 15* relate to the selection of Stephen Zill for the position of Chief of Police. In each case, rather than answering the Interrogatory, you stated you would provide documents under FRCP 33(d). Yet in each case the documents you provide *fail to answer the questions presented* by the Interrogatories.

For example, *INT 10* asks that you "[i]dentify by name, race, current address, employer and area of expertise of each individual who participated directly and indirectly in the promotional process during 2022 and 2023 for the selection of GCPD's new Chief of Police and describe what role each individual played in the selection process (e.g. – executive leadership team, applicant screening, selection committee, interview panelist, external and/or internal assessment center panelist)."

After objecting, you stated you would provide documents under FRCP 33(d) to answer this Interrogatory.

You then provided Documents that apparently were created during the Chief of Police promotional process (such as GastonCo-002911 to 3031), yet these documents fail to answer this Interrogatory. GastonCo-004859-4860 may be a full list of names of those persons who "participated directly or indirectly in the promotional process" for the Chief of Police, but we do not have anything that shows their race, their address, or their employer, nor have you stated the area of expertise of each person. Thus, please carefully review your records and fully answer this interrogatory.

*Int No. 11* asks you to identify "all documents, including but not limited to notes, memoranda, video- or audio-recordings, and test scores, related to any interviews and assessment centers conducted by you to fill the position of Chief of Police in early 2023, as well as any other documents upon which you relied in filling the position as set forth in your May 28, 2024 Position Statement to the EEOC regarding EEOC Charge No. 430-2024-01433."

You did provide your May 28 position statement and your amended Position statement of June 19, 2024, with attachments, but it appears you did not provide a full set of documents from the interviews and assessment centers. The exhibits to the Position statement (E,F, and G) show some notes about the candidates, but it appears that these are only the notes of three persons
In your "Police Chief Work Plan" you have listed ten people as on the selection committee. Please provide all notes from these persons related to the Police Chief selection.

*Int No. 12* asks that you "[i]dentify by name, race, and the point value scores of each candidate selected to advance to the interview and assessment center portion of the promotional process for the selection of the new GCPD's Chief of Police in 2022 and 2023. For each individual *not* selected to advance to the interview and assessment center portion of the promotional process, state why such individual was not selected and provide the point value scores assigned to each individual by the screening committee."

Again, you stated that documents provided pursuant to Rule 33(d) answer this Interrogatory but again they do not answer this Interrogatory. We do not have a list by race of the persons who did

3 | P a g e

advance to the assessment center and we do not have any information such as name, race and the score of those persons who did not advance to the interview and assessment center. Instead, we have copies of a blank form entitled "Candidate Scoring Rubric" with no data, scores or notations on the forms.

Thus, please carefully review your records and fully answer this interrogatory.

*Int No. 14* asks that you "[I]dentify all documents used by or relied upon by you in the selection of Defendant Zill for the position of GCPD Police of Chief in or about March 2023 and state the scores and feedback of each of the seven final candidates provided by the internal and external assessors as set forth in your May 28, 2024 Position Statement to the Equal Employment Opportunity Commission regarding EEOC Charge No. 430-2024-01433.

Again, you did not identify all documents used in the selection of Defendant Zill nor provide the feedback for each of the seven final candidates. We did see the document containing scores for seven candidates, but we do not have feedback from each of the interviewers for those seven candidates who seemed to make it through to the assessment center.

*Interrogatory No. 16* asks you, in part, to "…. State whether the vacancy for the Assistant Chief position was announced or published within the GCPD and describe whether the criteria used in the selection process was reduced to writing and/or published within the GCPD prior to Holder's promotion."

You have failed to Answer these portions of the Interrogatory. Please do so.

*Interrogatory No. 17* asks you, in part, to "…. State whether the vacancy for the Assistant Chief position was announced or published within the GCPD and describe whether the criteria used in the selection process was reduced to writing and/or published within the GCPD prior to Cole's promotion."

You have failed to Answer these portions of the Interrogatory. Please do so.


## II. REQUEST FOR PRODUCTION OF DOCUMENT RESPONSES DEFICIENCIES

In response to *RFP No. Three*, you state in part "[s]ee attached Declarations pages for Defendant County's EPLI policies produced with these responses." We have not seen that Declarations page, so please provide it.

Our *RFP No. 4* asks that you "[p]roduce all minutes of all open and closed sessions of the Board of County Commissioners for the period January 1, 2020 through the present date." You stated in part that you were reviewing "the closed session meeting minutes to verify, and will produce relevant, responsive, non-privileged documents." Please produce any responsive document which you have uncovered.

Our *RFP No. Seven* asks that you "[p]roduce all documents maintained by you which comprise the personnel file for the following individuals, including but not limited to said individuals' application for employment, annual job performance evaluations, commendations, awards,

4 | P a g e

disciplinary action, applications submitted for promotions, training records, test scores, status change forms or other documents reflecting promotions, bonuses, and salary increases.

    a.   Chief (retired) Joseph Ramey

    b.   Kim Eagles

    c.   Stephen Zill

    d.   Anderson Holder

    e.   Jon Cole

    f.   Matt Johnson

    g.   Robbie Waldrop

    h.   Reid Rollins

    i.   William Downey

    j.   Suzanne Mauney-Smith

    k.   Eric Johnson

    l.   Glen Bratton

    m.   Joseph Ramey

    n.   Vincent Wong

    o.   Susan Allen

    p.   Amia Massey

    q.   All persons named in your Initial Disclosures, Section A."

In your response you objected to production (alleging our request was overly broad, vague, not proportional, not leading to relevant materials) but you stated that you would provide responsive, non-privileged, relevant documents.

You have not done so, and it is not for you to decide what is relevant. For example, for the persons who received the promotions at issue in this case, to Chief of Police in 2023 and the three Assistant Chiefs in 2023 and 2024, Stephen Zill, Anderson Holder, Jon Cole, and Matt Johnson, you have not provided "application for employment, annual job performance evaluations, commendations, awards, disciplinary action, applications submitted for promotions, ……….. test scores, status change forms or other documents reflecting promotions, bonuses, and salary increases." Moreover, you have not provided any personnel records for most of the remaining persons listed in this

Interrogatory.

In the interests of compromise, we are willing to forego the personnel files of Chief Ramey, Robbie Waldrop, Reid Rollins, Glen Bratton, Vincent Wong, Susan Allen, and Amia Massey. Please produce the remaining files in their entirety as described in this RFP.

*RFP No. 8 and 9*   These two RFP's asks you to provide all complaints identified in response to *Interrogatory No. 3,* as well as all investigative documents pertaining to those complaints. Again, you refuse to provide complaints arising outside of the GCPD, yet you have failed to explain why those complaints would not meet the discovery standard.

Please supplement your response to this RFP.

*RFP No. 10*   This RFP asks you to produce all applications submitted in response to Gaston County's announced search to fill the position of Chief of Police in late 2022 and all other applications for Chief of Police in 2022 and 2023. We did not receive these documents. Please supplement your response to this RFP.

*RFP No. 11*   This RFP asks you to produce "all documents, including but not limited to notes, memoranda, video- or audio-recordings, and test scores, related to any interviews and assessment centers conducted by you to fill the position of Chief of Police in early 2023, as well as any other documents upon which you relied in filling the position as set forth in your May 28, 2024 Position Statement to the EEOC regarding EEOC Charge No. 430-2024-01433."

As discussed above you did send us your Position Statement and attachments, as well as scores related to seven Chief of Police candidates, but you have failed to produce <u>all</u> "notes, memoranda, video- or audio-recordings, and test scores, related to any interviews and assessment centers conducted by you to fill the position of Chief of Police." Please provide a complete response to this RFP. Your response should include all documents used by and created by all persons involved in the selection of Chief Zill including all persons on the screening committee and the selection committee as well as the stakeholders identified on p.4859.

*RFPs No.15, 16 and 18*  ask that you "[p]roduce all documents, including but not limited to notes, memoranda, video- or audio-recordings, and test scores, related to any interviews and assessment centers conducted by you...... to fill the position of Assistant Chief of Police" for the three Assistant Chief Positions filled in 2023 and 2024 by Anderson Holder, Jon Cole and Matthew Johnson.

In your response you object to these requests (as overly broad, vague, not proportional to the needs of the case and seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence) but you state that you will produce "relevant, responsive, non-privileged documents." It is not for you to decide what is relevant. Please produce all non-privileged documents requested in these three RFP's.

*RFP No.23* asks that you "[p] all test scores and eligibility lists for the positions of Sergeant and Captain as maintained in the GCPD Police Chiefs' logs for the period beginning January 1, 2001 through the present date." You have not done so, other than the lists on GastonCo-002860-2867.

These documents have redactions of names and other information which are unnecessary and interfere with our understanding of and use of the documents. Redactions include the names of the persons receiving scores on Captain and Sergeants exams. Please provide unreacted copies of these documents.

We are willing to change the time frame of this request to 2010 to the present. This request for these scores and eligibility lists are reasonably calculated to lead to the discovery of admissible evidence of race discrimination. It is anticipated that these lists will assist in showing that fully qualified African American GCPD employees were held in lower positions longer than their white counterparts and were repeatedly denied promotions to positions that were then filled by their white counterparts.

Many of your responses recite boiler-plate objections and are insufficient under Rules 26 and 33. The assertion of such boilerplate objections is grounds for overruling the objections. *See, Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 247 (M.D.N.C. 2010). Furthermore, Rule 33 requires that objections to an interrogatory be stated with specificity. See, *Josephs v. Harris Corp.*, 677 F. 2d 985, 992 (3d. Cir. 1982) ("[T]he mere statement by a party that the interrogatory was 'overly broad, burdensome, oppressive and irrelevant' is not adequate to voice a successful objection to an interrogatory..........................."); see also, *Oppenheimer v. Episcopal Communicators, Inc.*, 2020 U.S. Dist. LEXIS 146398 *6 (W.D.N.C. Aug. 14, 2020).

## III.
## PRIVILEGE LOG

You have objected to plaintiffs' discovery requests in part on the basis of a claim of privilege or a claim of attorney work product. However, you have not served a privilege log regarding what information is actually subject to a claim of privilege or is being withheld under the work product doctrine.

Please produce a privilege log which identifies what exactly your client has withheld; otherwise, we will deem these objections to have been waived. *See, Oppenheimer v. Williams,* 2021 U.S. Dist. LEXIS, 221997 *8 (D.S.C. Nov. 17, 2021); *Smith v. James C. Hormel Sch. of the Va. Inst. of Autism*, 2010 U.S. Dist. LEXIS 95668 *11 (W.D. Va. Sept. 14, 2010) (failure to timely produce a privilege log may constitute a waiver of any asserted privilege) *[citations omitted]*.

Please supplement and provide complete responses to Plaintiffs' First Set of Interrogatories and First Requests for Production of Documents on or before September 3, 2025. Please also provide a signed verification regarding the accuracy and truthfulness of the responses to plaintiffs' interrogatories.

We are certainly willing to have a phone call with you to try to resolve this potential discovery dispute without court intervention. If you would like to have a call let us know. Thank you.

Very truly yours,

*Julie H. Fosbinder*

Julie H. Fosbinder

cc: Jenny L. Sharpe Attorney at Law
Brent Roberts
Reginald E. Bloom, Jr.
Jennifer B. Milak

# EXHIBIT E

## SHARPE DECLARATION


## Roberts & Bloom v. Gaston County, NC, et al.
3 messages

**jenny sharpe** <sharpeattorney@gmail.com>                                                    Tue, Aug 19, 2025 at 8:06 AM
To: "Lucchesi, Kathleen K. (Charlotte)" <Kathleen.Lucchesi@jacksonlewis.com>
Cc: "Jennifer B. Milak" <jmilak@teaguecampbell.com>, "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>,
Julie Fosbinder <jhanfos2@gmail.com>, LZampa@teaguecampbell.com
Bcc: jenny sharpe <sharpeattorney@gmail.com>, Brent Roberts <brobertsgcps@yahoo.com>, Reggie Bloom
<reggie9924@gmail.com>

Kathi,

I have attached for service upon you and your clients Plaintiffs' Second Requests for Production of Documents.  If you
have any questions or concerns, please let Julie and me know.

We are planning to send a formal deficiency letter to you regarding your clients' responses to Plaintiffs' first written
discovery.  In the meantime, you have not produced certain documents which are relevant to the promotional process for
the GCPD's chief of police.  For instance, you have not provided the applications of all of the applicants for the position,
completed candidate scoring rubrics, interview evaluations, candidate binders with handwritten or typewritten notes,
assessment records, videos of the simulated press conference, as well as those documents outlined in John Joye's
litigation hold letter dated 2/9/2024 (GastonCo 4813-14).  We ask that you produce these documents to us on or before
August 26th.

Finally, I hope we will hear from you regarding our proposed motion to extend the deadlines contained in the case
management order.  If not, we intend to file the motion this week.

Many thanks.

Jen
Jenny L. Sharpe
Attorney at Law

**J Sharpe, PLLC**
**15720 Brixham Hill Avenue**
**Suite 300**
**Charlotte, North Carolina  28277**
**Telephone:  (704) 944-3272**
**Facsimile:   (704) 944-3201**

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S.
federal tax advice contained in this communication (or in any attachment) is not intended or written to be used, and
cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed in this communication (or in any attachment).

PRIVILEGED AND CONFIDENTIAL: This electronic message and any attachments are confidential property of the
sender. The information is intended only for the use of the person to whom it was addressed. Any other interception,
copying, accessing, or disclosure of this message is prohibited. The sender takes no responsibility for any unauthorized
reliance on this message. If you have received this message in error, please immediately notify the sender and purge the
message you received. Do not forward this message without permission.

 **Roberts-Discorequests_2dGastonCo.pdf**
208K

**jenny sharpe** <sharpeattorney@gmail.com>                                                    Tue, Sep 30, 2025 at 3:33 PM
To: "Lucchesi, Kathleen K. (Charlotte)" <Kathleen.Lucchesi@jacksonlewis.com>

Cc: "Jennifer B. Milak" <jmilak@teaguecampbell.com>, "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>, Julie Fosbinder <jhanfos2@gmail.com>, LZampa@teaguecampbell.com
Bcc: jenny sharpe <sharpeattorney@gmail.com>, Brent Roberts <brobertsgcps@yahoo.com>, Reggie Bloom <reggie9924@gmail.com>

Kathi,

On August 19th, we served Plaintiffs' second requests for production of documents. I have not received any response to that discovery request nor have I received any request for an extension of time from you.

Since the time for responding has passed, we will consider all objections to have been waived. Therefore, we ask that you produce the documents in question no later than Friday, October 3, 2025. Otherwise, we will file a motion to compel with the court. Thank you.

Jenny
Jenny L. Sharpe
Attorney at Law

J Sharpe, PLLC
15720 Brixham Hill Avenue
Suite 300
Charlotte, North Carolina 28277
Telephone: (704) 944-3272
Facsimile: (704) 944-3201

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication (or in any attachment).

PRIVILEGED AND CONFIDENTIAL: This electronic message and any attachments are confidential property of the sender. The information is intended only for the use of the person to whom it was addressed. Any other interception, copying, accessing, or disclosure of this message is prohibited. The sender takes no responsibility for any unauthorized reliance on this message. If you have received this message in error, please immediately notify the sender and purge the message you received. Do not forward this message without permission.

[Quoted text hidden]

---

**Lucchesi, Kathleen K. (Charlotte)** <Kathleen.Lucchesi@jacksonlewis.com>                    Tue, Sep 30, 2025 at 8:20 PM

To: jenny sharpe <sharpeattorney@gmail.com>
Cc: "Jennifer B. Milak" <jmilak@teaguecampbell.com>, "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>, Julie Fosbinder <jhanfos2@gmail.com>, "LZampa@teaguecampbell.com" <LZampa@teaguecampbell.com>, "Wallace, Allie (Charlotte)" <Allie.Wallace@jacksonlewis.com>, "O'Neill, Patricia (Charlotte)" <Patricia.O'Neill@jacksonlewis.com>

Hi Jenny,

My apologies – our legal assistant left the firm in early-September and it appears as though she did not calendar your discovery request when it came in. We've copied our paralegal, Allie Wallace and new legal assistant, Pat O'Neill on this email – kindly include them on all emails to us going forward. In the meantime, we have requested the information from our client and will produce it as soon as we receive and process it. We appreciate your courtesy in allowing us to get those to you.

Additionally, we anticipate serving documents beginning tomorrow that will include personnel records, emails, insurance information, and documents from the chief of police selection. Please let us know what questions you have.

Thanks,
Kathi




**Kathleen K. Lucchesi**
Attorney at Law

**Jackson Lewis P.C.**
200 South College Street
Suite 1550
Charlotte, NC 28202
Direct: (980) 465-7245 | Main: (980) 465-7237 | Mobile: (704) 577-2986
Kathleen.Lucchesi@Jacksonlewis.com | www.jacksonlewis.com

[Quoted text hidden]

 **2025-09-30 - Gaston Co Responses to Pls Second RPD (Roberts v. Gaston County et al).pdf**
210K

EXHIBIT F


SHARPE DECLARATION



Jennifer B. Milak
Partner
Raleigh Office
jmilak@teaguecampbell.com

September 30, 2025

**VIA EMAIL**
Jenny L. Sharpe
J Sharpe, PLLC
15720 Brixham Hill Avenue
Suite 300
Charlotte, NC 28277

Julie H. Foshbinder
Foshbinder Law Office
840 Seneca Place
Charlotte, NC 28210

RE:     Roberts, Brent and Reginald E. Bloom v. Gaston County, North Carolina; Chad Brown,
        in hid individual capacity; and Stephen Zill, in his individual capacity
        D/Loss:        10/28/2024
        Court No:      3:240cv-0927
        Our File:      923.241203

Dear Counsel:

Please find enclosed Brown's Supplemental Discovery Responses. As discussed in his deposition, attached are his texts exchanges with Officer Downey.

If you have any questions or concerns, please do not hesitate to call.

Sincerely,

*Jennifer B. Milak*

Jennifer B. Milak

JBM/ldz
Enclosures
cc:     Kathleen Lucchesi / Daniel Leake (via U.S. Mail w/enclosures)

**Offices in Raleigh and Asheville**
CENTRAL MAILING: P.O. Box 19207 Raleigh, NC 27619-9207 | F 919.873.1150
Case 3:24-cv-00927-DCK   Document 71-1   Filed 10/21/25   Page 65 of 79



**Chief Bowie** ⌄

> Par for the course
> 8:38 AM

Yup ugh

8:38 AM

> And they wonder
> why we have not
> been invited in the
> last 3 or 4 years
> 9:03 AM

I'm super frustrated-

Supposedly
someone in
the breakfast

BBOWN-000077



10:21   ▣ 🔋 40% 🔋

< **C** **Chief Bowie** ∨   ⋮

Where you at?
Department
breakfast this
morning-
8:35 AM

Didn't get an
invitation

Sorry wish I knew
8:36 AM

Good Lord .

You're not the only
one- they forgot to
invite the retirees
too

⌄

BROWN - 000078

**< Chief Bowie**
9:06 AM, Oct 21

I'm super frustrated–

Supposedly someone in the breakfast committee forgot to send out emails

How does that happen?  This is where I would invite commissioners, the manager, assistant managers, DA Page and his staff, other chiefs and the Sheriff, etc.

Things need to change– I have probably 6-7 pages of ideas and things we need to do.  Get back to the basics of who we are.

Killa me

*BROWN - 000079*



Tuesday, October 25, 2022

Just dropped my vote for Commissioner Chad Brown!

11:12 AM

Lol thank you

12:15 PM

Dude-
Any timeline? I'm getting asked everyday what's going on. Our people are pretty uneasy

BROWN - 000076

Dude–
Any timeline? I'm getting asked everyday what's going on. Our people are pretty uneasy.

If you can't say or I shouldn't ask– you tell me. But it's been almost a month since the announcement and the people around

So- ima list you as a reference on this application

Seriously if you have time in the next couple weeks and it is not a conflict of interest, I'd like grab lunch and bounce some ideas off you. If it is- I completely understand.

3:22 PM



12:17 PM

Should be coming out ill ask why it hasn't. You can always ask me anything brother no appt necessary

12:19 PM

Thank ya

12:19 PM

Friday, November 4, 2022



MMS

# EXHIBIT G

## SHARPE DECLARATION



jenny sharpe <sharpeattorney@gmail.com>

---

## Roberts & Bloom v. Gaston County, et al - Downey Deposition

7 messages

---

**Lucchesi, Kathleen K. (Charlotte)** <Kathleen.Lucchesi@jacksonlewis.com>        Mon, Oct 6, 2025 at 5:53 PM
To: jenny sharpe <sharpeattorney@gmail.com>, Julie Fosbinder <jhanfos2@gmail.com>
Cc: "Jennifer B. Milak" <jmilak@teaguecampbell.com>, "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>,
"Wallace, Allie (Charlotte)" <Allie.Wallace@jacksonlewis.com>, "O'Neill, Patricia (Charlotte)"
<Patricia.O'Neill@jacksonlewis.com>

Hi Jenny and Julie,

Please see the attached correspondence regarding the deposition of Captain Billy Downey. Please let me know what
questions you have.

Thanks,
Kathi



**Kathleen K. Lucchesi**
Attorney at Law

**Jackson Lewis P.C.**
200 South College Street
Suite 1550
Charlotte, NC 28202
Direct: (980) 465-7245 | Main: (980) 465-7237 | Mobile: (704) 577-2986
Kathleen.Lucchesi@Jacksonlewis.com | www.jacksonlewis.com

---

**2 attachments**

📄 **2025-10-06 Ltr re Downey Deposition.pdf**
241K

📄 **2010 Formal Ethics Opinion 3 _ North Carolina State Bar.pdf**
40K

---

**Lucchesi, Kathleen K. (Charlotte)** <Kathleen.Lucchesi@jacksonlewis.com>        Tue, Oct 7, 2025 at 2:12 PM

To: jenny sharpe <sharpeattorney@gmail.com>, Julie Fosbinder <jhanfos2@gmail.com>
Cc: "Jennifer B. Milak" <jmilak@teaguecampbell.com>, "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>,
"Wallace, Allie (Charlotte)" <Allie.Wallace@jacksonlewis.com>, "O'Neill, Patricia (Charlotte)"
<Patricia.O'Neill@jacksonlewis.com>

Hi Jenny and Julie,

We haven't heard back from you regarding our request yesterday that you withdraw your notice of Captain Downey's
deposition. Our assumption is that you intend to go forward despite the conflicts identified in our letter. Unless we hear
from you otherwise, we plan to file this afternoon a motion to quash your notice of deposition, requesting a protective
order and cost 

Please let us know what questions you have,

Kathi



**Kathleen K. Lucchesi**
Attorney at Law

**Jackson Lewis P.C.**
200 South College Street
Suite 1550
Charlotte, NC 28202
Direct: (980) 465-7245 | Main: (980) 465-7237 | Mobile: (704) 577-2986
Kathleen.Lucchesi@Jacksonlewis.com | www.jacksonlewis.com

[Quoted text hidden]
[Quoted text hidden]

---

**2 attachments**

 **2025-10-06 Ltr re Downey Deposition.pdf**
241K

 **2010 Formal Ethics Opinion 3 _ North Carolina State Bar.pdf**
40K

---

**Julie Fosbinder** <jhanfos2@gmail.com>                                        Tue, Oct 7, 2025 at 2:28 PM
To: "Lucchesi, Kathleen K. (Charlotte)" <Kathleen.Lucchesi@jacksonlewis.com>
Cc: jenny sharpe <sharpeattorney@gmail.com>, "Jennifer B. Milak" <jmilak@teaguecampbell.com>, "Leake, Daniel Q. II
(Charlotte)" <Daniel.Leake@jacksonlewis.com>, "Wallace, Allie (Charlotte)" <Allie.Wallace@jacksonlewis.com>, "O'Neill,
Patricia (Charlotte)" <Patricia.O'Neill@jacksonlewis.com>

Kathi;

We will get back to you by 4:30 today about your motion to quash.

Julie
[Quoted text hidden]
--
Julie H. Fosbinder
Fosbinder Law Office
840 Seneca Place
Charlotte, NC 28210
Phone: (704) 333-1428
Cell:  (704) 560-8600
Fax: (704) 333-1431

NOTICE: This communication (including any attachment) is being sent by or on behalf of a lawyer or law firm and may
contain confidential or legally privileged information.  The sender does not intend to waive any privilege,including the
attorney-client privilege, that may attach to this communication.If you are not the intended recipient, you are not
authorized to intercept, read, print, retain, copy, forward, or disseminate this communication.  If you have received this
communication in error,please notify the sender immediately by email and delete this communication
and all copies.

---

jenny sharpe <sharpeattorney@gmail.com>                                        Tue, Oct 7, 2025 at 4:20 PM

To: "Lucchesi, Kathleen K. (Charlotte)" <Kathleen.Lucchesi@jacksonlewis.com>, "Jennifer B. Milak"
<jmilak@teaguecampbell.com>
Cc: "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>, Julie Fosbinder <jhanfos2@gmail.com>,
LZampa@teaguecampbell.com, "Wallace, Allie (Charlotte)" <Allie.Wallace@jacksonlewis.com>,
Patricia.o'neil@jacksonlewis.com
Bcc: jenny sharpe <sharpeattorney@gmail.com>, Brent Roberts <brobertsgcps@yahoo.com>, Reggie Bloom
<reggie9924@gmail.com>

Kathi,

I carefully reviewed your letter and the 2010 formal ethics opinion that you sent yesterday evening. At your suggestion,
I did speak with the State Bar this afternoon and we have determined that there is no conflict of interest with regard to
Captain Downey's deposition. If you intend to file your motion, we will seek attorneys' fees and costs incurred in
responding to your motion.

Jenny
Jenny L. Sharpe
Attorney at Law

J Sharpe, PLLC
15720 Brixham Hill Avenue
Suite 300
Charlotte, North Carolina 28277
Telephone: (704) 944-3272
Facsimile: (704) 944-3201

IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S.
federal tax advice contained in this communication (or in any attachment) is not intended or written to be used, and
cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed in this communication (or in any attachment).

PRIVILEGED AND CONFIDENTIAL: This electronic message and any attachments are confidential property of the
sender. The information is intended only for the use of the person to whom it was addressed. Any other interception,
copying, accessing, or disclosure of this message is prohibited. The sender takes no responsibility for any unauthorized
reliance on this message. If you have received this message in error, please immediately notify the sender and purge the
message you received. Do not forward this message without permission.


On Tue, Oct 7, 2025 at 2:12 PM Lucchesi, Kathleen K. (Charlotte) <Kathleen.Lucchesi@jacksonlewis.com> wrote:
[Quoted text hidden]

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                    Tue, Oct 7, 2025 at 4:20 PM
To: sharpeattorney@gmail.com




## Address not found

Your message wasn't delivered to
**Patricia.o'neil@jacksonlewis.com** because the address
couldn't be found, or is unable to receive mail.

**LEARN MORE**
⚠ This link will take you to a third-party site

The response from the remote server was:

550 Invalid Recipient - https://community.mimecast.com/docs/DOC-1369#550
[h3ugJxcxONC5ckHxyrR0sw.us682]

Final-Recipient: rfc822; Patricia.o'neil@jacksonlewis.com
Action: failed
Status: 5.1.1
Remote-MTA: dns; us-smtp-inbound-2.mimecast.com. (170.10.132.141, the server
for the domain jacksonlewis.com.)
Diagnostic-Code: smtp; 550 Invalid Recipient - https://community.mimecast.com/docs/DOC-1369#550
[h3ugJxcxONC5ckHxyrR0sw.us682]
Last-Attempt-Date: Tue, 07 Oct 2025 13:20:52 -0700 (PDT)

---

☐ noname
   4K

---

**Lucchesi, Kathleen K. (Charlotte)** <Kathleen.Lucchesi@jacksonlewis.com>       Tue, Oct 7, 2025 at 9:51 PM
To: jenny sharpe <sharpeattorney@gmail.com>, "Jennifer B. Milak" <jmilak@teaguecampbell.com>
Cc: "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>, Julie Fosbinder <jhanfos2@gmail.com>,
"LZampa@teaguecampbell.com" <LZampa@teaguecampbell.com>, "Wallace, Allie (Charlotte)"
<Allie.Wallace@jacksonlewis.com>, "O'Neill, Patricia (Charlotte)" <Patricia.O'Neill@jacksonlewis.com>

Jenny,

Defendants are preparing to file a motion to quash and motion for protective order in the next 30 minutes and believe
Capt. Downey's deposition to be stayed pending the Court's ruling on this motion. As such, he will not appear for his
deposition tomorrow.

Thanks,

Kathi

---



**Kathleen K. Lucchesi**
Attorney at Law

**Jackson Lewis P.C.**
200 South College Street
Suite 1550
Charlotte, NC 28202
Direct: (980) 465-7245 | Main: (980) 465-7237 | Mobile: (704) 577-2986
Kathleen.Lucchesi@Jacksonlewis.com | www.jacksonlewis.com

From: jenny sharpe <sharpeattorney@gmail.com>
Sent: Tuesday, October 7, 2025 4:20:38 PM

**To:** Lucchesi, Kathleen K. (Charlotte) <Kathleen.Lucchesi@Jacksonlewis.com>; Jennifer B. Milak <jmilak@teaguecampbell.com>
**Cc:** Leake, Daniel Q. II (Charlotte) <Daniel.Leake@jacksonlewis.com>; Julie Fosbinder <jhanfos2@gmail.com>; LZampa@teaguecampbell.com <LZampa@teaguecampbell.com>; Wallace, Allie (Charlotte) <Allie.Wallace@jacksonlewis.com>; Patricia.o'neil@jacksonlewis.com <Patricia.o'neil@jacksonlewis.com>
**Subject:** Re: Roberts & Bloom v. Gaston County, et al - Downey Deposition

[Quoted text hidden]

---

**Julie Fosbinder** <jhanfos2@gmail.com>                                  Wed, Oct 8, 2025 at 1:26 AM
To: "Lucchesi, Kathleen K. (Charlotte)" <Kathleen.Lucchesi@jacksonlewis.com>
Cc: jenny sharpe <sharpeattorney@gmail.com>, "Jennifer B. Milak" <jmilak@teaguecampbell.com>, "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>, Linda Zampa <LZampa@teaguecampbell.com>, "Wallace, Allie (Charlotte)" <Allie.Wallace@jacksonlewis.com>, "O'Neill, Patricia (Charlotte)" <Patricia.O'Neill@jacksonlewis.com>

Counsel:

I just read this email. There is no basis that I am aware of for your belief that the deposition of Capt. Downey stayed simply because you filed a motion. In fact, the quick research I did suggests that no stay is in place until there is a court order.

If you have rulings to the contrary please provide those immediately.

Thus please produce Capt. Downey tomorrow morning at the designated time.

Julie

Julie H. Fosbinder
Fosbinder Law Office
840 Seneca Place
Charlotte, NC 28210
Phone: (704) 333-1428
Cell: (704) 560-8600
Fax: (704) 333-1431

NOTICE: This communication (including any attachment) is being sent by or on behalf of a lawyer or law firm and may contain confidential or legally privileged information. The sender does not intend to waive any privilege, including the attorney-client privilege, that may attach to this communication. If you are not the intended recipient, you are not authorized to intercept, read, print, retain, copy, forward, or disseminate this communication. If you have received this communication in error, please notify the sender immediately by email and delete this communication and all copies.

[Quoted text hidden]

---

**2 attachments**



**image853549.png**
2K



**image431816.png**
2K

**Lucchesi, Kathleen K. (Charlotte)** <Kathleen.Lucchesi@jacksonlewis.com>

To: Julie Fosbinder <jhanfos2@gmail.com>
Cc: jenny sharpe <sharpeattorney@gmail.com>, "Jennifer B. Milak" <jmilak@teaguecampbell.com>, "Leake, Daniel Q. II (Charlotte)" <Daniel.Leake@jacksonlewis.com>, Linda Zampa <LZampa@teaguecampbell.com>, "Wallace, Allie (Charlotte)" <Allie.Wallace@jacksonlewis.com>, "O'Neill, Patricia (Charlotte)" <Patricia.O'Neill@jacksonlewis.com>

Julie and Jenny,

Capt. Downey will not appear for deposition today. In addition to the pending motion, Capt. Downey is not under subpoena and has not been compelled to appear today. Finally, as you may know, Capt. Downey works overnights. He worked until 2a this morning on the knowledge that the motion was being filed and that you were on notice that he would not be waiving his attorney-client privilege at any deposition by you in this matter.

Thanks,

Kathi



**Kathleen K. Lucchesi**
Attorney at Law

**Jackson Lewis P.C.**
200 South College Street
Suite 1550
Charlotte, NC 28202
Direct: (980) 465-7245 | Main: (980) 465-7237 | Mobile: (704) 577-2986
Kathleen.Lucchesi@Jacksonlewis.com | www.jacksonlewis.com

[Quoted text hidden]